JOHN REEVES ELLERMAN

v.

THE CHICAGO JUNCTION RAILWAYS AND UNION STOCKYARDS COMPANY et al.

1. Individual stockholders cannot question. in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation and in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest

decision of the directors if their powers are without limitation and free from restraint.

2. The courts will, as a general rule, presume that contracts made by a corporation which appear *to be designed to promote its legitimate and profitable operation,* are within the limits of its powers, and if their validity be assailed will require the assailant to assume the burden of demonstrating that fact.

3. The General Corporation act gives general powers to all corporations organized under the laws of New Jersey; the certificate of incorporation required by that act is the charter of the company, and the equivalent of a special act of the legislature before the amendments to the constitution.

4. Corporations organized under the general law are vested with the powers conferred by the general act, and those contemplated by the certificate, and such incidental powers with respect of the general and special powers, as are necessary, in the sense of convenient, reasonable and proper.

5. While the act permits incorporation for "any lawful business or purpose whatsoever," and the law gives all necessary powers thereto, it does not recognize as embraced therein powers to do those things which would deprive the corporation of its ability to carry out the objects for which it was formed, or discharge any duties which it might under its charter owe to the public, or which are contrary to the policy of the law.

6. The doctrine of *ultra vires* ought to be reasonably, and not unreasonably, understood and applied, and whatever may be fairly regarded as incidental to, and consequential upon, those things which are authorized by the charter of the company, ought not (unless expressly prohibited) to be held by judicial construction to be *ultra vires.*

7. A corporation having power to take and dispose of the securities of another corporation may guarantee their payment if it disposes of them to another party in payment of its own debt; if it buys property subject to a mortgage securing bonds, it may guarantee the payment thereof if said guarantee is taken as payment *pro tanto* of its debt; the two transactions are the same in result, and mere routine of action cannot affect validity.

8. Contracts for the compromise of suits and for non-competition are within the exercise of powers incident to corporate management and business.

9. Contracts which impose an unreasonable restraint upon the exercise of a business, trade or profession are void, but contracts in reasonable restraint thereof are valid.

10. The test to be applied in determining whether a restraint is reasonable or not, is to consider whether the restraint is only such as is necessary to afford a fair protection to the interest of the party in whose favor it is given, and not so large as to interfere with the interest of the public.

11. A covenant by parties selling the plant and business of stockyards not to engage in the business for a certain number of years, nor in the place where they are located, or within two hundred miles thereof, is not unreasonable, and not an illegal restraint of trade.

On bill and answers.

This bill is filed by the complainant on behalf of himself, a stockholder in the Chicago Junction Railways and Union Stockyards Company, and all other stockholders therein who shall come in and contribute to the expenses of this suit, to enjoin the parties thereto from carrying into effect a certain agreement made by the directors of the said company, dated July 27th, 1891, with the defendants, Armour & Company, Nelson Morris & Company and Swift & Company.

The Chicago Junction Railways and Union Stockyards Company, hereinafter styled "The Junction Company," was organized on or about the 10th day of July, 1890, under and by virtue of the provisions of the laws of New Jersey. The objects for which the said company was formed, as stated in its certificate, are to purchase, hold, pledge, transfer, sell, or otherwise dispose of, or deal in, the shares of the capital stock of the Union Stockyards and Transit Company, a corporation organized under the laws of the State of Illinois; to receive, collect and dispose of the dividends on any of said shares held by it, and to exercise, in respect of any of said shares held by it, any and all the rights, powers and privileges of owners of shares of said capital stock; to purchase, hold and dispose of any bonds, debentures or other evidences of indebtedness of said The Union Stockyards and Transit Company of Chicago, and to do any and all acts and things tending to increase the value of the shares of the capital stock of said company; to issue bonds, and to secure the same by a pledge or deed of trust of or upon any part of such shares, or any other property held or owned by the company, and to sell or pledge such bonds for proper corporate purposes; and in the promotion of its corporate business to purchase, receive, hold and dispose of any securities of any person or corporation, whether such securities shall be bonds, mortgages, debentures, notes or shares of capital stock, and in respect of any such securities to exercise any and all the rights and privileges of owners thereof, and to the extent authorized by law to lease, purchase, hold, sell,

assign, mortgage and convey real and personal property of any name and nature.

The Union Stockyards and Transit Company of Chicago, hereinafter styled "The Transit Company," is a corporation organized and existing under and in pursuance of an act of the legislature of the State of Illinois, approved February 13th, 1865, entitled "An act to incorporate the Union Stockyards and Transit Company of Chicago."

The Transit Company was formed, among other things, to locate, construct and maintain, upon land purchased for such purpose, in convenient proximity to the southerly limits of the city of Chicago, all the necessary yards, enclosures, buildings, structures, railway lines, tracks, switches, turn-outs and aqueducts, for the reception, safe-keeping, feeding and watering, and for the weighing, delivering and transfer of cattle and live stock of every description, and also dead and undressed animals that may be at or passing through or near the city of Chicago, and for the accommodation of the business of a general union stockyard for cattle and live stock, including the erection and establishment of one or more hotel buildings, and the right to use the same, if deemed expedient, for the convenience of drovers, dealers, and the public doing business at the said yards, with power to enlarge, relocate and reconstruct said yards and buildings as necessary or expedient, subject to the restrictions mentioned as to the location of the same, and to make advances of money upon cattle and live stock, to make such reasonable charges as may be just and proper for such care, subsistence, handling and advances, and to construct a railway with one or more tracks from the grounds selected for its yards, so as to connect outside of the city of Chicago with the tracks of railroads which terminate in the city of Chicago, the lines of which enter the said city on the south between the lake shore and the southwest corner of said city, and on the west between certain points in the said charter designated, with power to take by grant land and real estate for the purposes aforesaid, and to acquire by condemnation, for the purpose of constructing their railroad tracks, lands for which no agreement could be made with the owners thereof,

conferring on the company all the rights, privileges, franchises and immunities contained in the act of said state entitled "An act to amend the law to condemn the right of way for the purpose of internal improvement," approved April, 1852, and the amendments thereof, and to transport and allow to be transported on their railroad all cattle and live stock, and persons accompanying the same, to and from their yards; and also to transport and allow to be transported between the railroads centering in said city and so connected by the road or roads built by the company, by steam or other power, freight and property of every kind as well as stock and cattle, and to take and receive toll for such freight and property transported. In section 2 its powers were restricted so as not to authorize the operation of a railroad for the conveyance of passengers or freight in the city of Chicago, and all exclusive contracts for the transportation of cattle, hogs or other freight over the road are prohibited under a penalty of an absolute forfeiture of the rights and franchises conferred. Its capital was originally fixed at $1,000,000, and the power to issue bonds was limited to $500,000. Its capital was afterwards, but before the 10th day of July, 1890, the date that the Junction Company commenced business, duly increased to $13,200,000, divided into one hundred and thirty-two thousand shares of $100 each, and at that date all of said shares had been issued and are now outstanding.

In pursuance of the powers conferred by said charter, the Transit Company, in or about the year 1865, became established in business in the city of Chicago and the owner of a large plant and property therein. The said company now owns all of the capital stock of the Chicago and Indiana State Line Railroad Company, and had so owned the same for a long time previous to the 10th day of July, 1890, and the said two companies during all such time have owned, and still own, four hundred and seventy acres of land and one hundred and thirty miles of steel-tracked railway, all situate in the city of Chicago. The Transit Company for a long time previous to the 10th day of July, 1890, and ever since, has owned, and now owns, about one mile of river front in the said city of Chicago, accessible to the largest lake vessels,

with docks half a mile in extent, all connected with the said railroad tracks, and about one mile of frontage on Halsted street and three-fourths of a mile on Forty-seventh street, both of which streets are important thoroughfares.   On the greater part of said land are railway sidings, cattle-sheds and pens to accommodate twenty-five thousand head of cattle, twelve thousand sheep and one hundred and sixty thousand hogs, brick stabling for two thousand horses, water works, forty miles of water and drainage pipes, fifteen miles of macadamized streets, bank buildings, merchants' offices, a cattle exchange, a hotel with capacity for five hundred guests, an extensive electric light plant lighting the yards, a hotel exchange, a large warehouse and depots, and the railway aforesaid extends north and southeast so as to connect with every railroad entering the city of Chicago.   The profits of the said company are principally derived from a yardage charge or toll upon cattle, calves, hogs, sheep and horses received at said company's yards, and from the sale of hay, corn and other feed for the use of said cattle and animals while in said yards.   During the year 1889 the said company received at said yards three million one hundred and forty-six thousand two hundred and forty-nine cattle and calves, five million nine hundred and ninety-eight thousand five hundred and twenty-six hogs, one million eight hundred and thirty-two thousand four hundred and sixty-nine sheep and seventy-nine thousand nine hundred and twenty-six horses.   For the year ending the 30th day of June, 1890, the net profits of the said company amounted to more than $1,700,000, and the net profits of said company have materially increased since that date.

The total amount of the capital stock of the said The Junction Company, authorized by its incorporation, is $13,000,000, divided into one hundred and thirty thousand shares of $100 each, one-half of which is preferred and the other general or common stock.   The said company commenced business, as provided in said certificate of incorporation, and on or about the 10th day of July, 1890, issued the whole amount of its capital stock, both preferred and common, except about five thousand shares.   The complainant is the holder and owner of ninety-one

Ellerman v. Chicago Junction Railways &c. Co.

-shares of the said preferred stock and two hundred and ninety-two shares of the said general or common stock thereof, and has so held and owned the same for a long time, and previous to the negotiations for and the date of the agreement involved in this suit.

On or about the 10th day of July, 1890, the Junction Company purchased one hundred and twenty-nine thousand seven hundred and seventy shares of the capital stock of the said Transit Company for the sum of $22,587,283.90, of which $6,500,000 were paid for by the bonds of the Junction Company and the balance in cash. The bonds aforesaid were part of a certain issue of negotiable bonds of the Junction Company, amounting in the aggregate to $10,000,000, each bond being of $1,000 of principal and payable on the 1st day of July, 1915, bearing interest at the rate of five per cent. per annum, payable semi-annually. The said bonds were secured by one hundred and twenty thousand shares of capital stock of the Transit Company, purchased and acquired by the said Junction Company. The balance of the whole issue of said bonds was disposed of by the Junction Company, together with at least $12,441,900 of its preferred and common capital stock, for cash at par, by means of all which the Junction Company was enabled to purchase, and did purchase, the one hundred and twenty-nine thousand seven hundred and seventy shares of the capital stock of the Transit Company, and all of which shares the Junction Company so purchased and owned previous to the negotiations for, and the making of, the agreement of the 27th day of July, 1891, and still owns the same.

The principal business of the Transit Company consists of the receipt at its stockyards, in Chicago, of cattle, calves, hogs, sheep and horses, shipped to it from all points in the Mississippi valley and points westward thereof and elsewhere, and for which animals a fixed charge for yardage and charges for feed are made and received while in said yards; and the principal purchasers of said animals, sent to said yards, are the various owners of slaughtering, packing and canning establishments at the city of Chicago, which establishments are situate around and about said

yards. Among them are the slaughtering, packing and canning establishments or plants of Armour & Company, Nelson Morris & Company and Swift & Company (hereinafter sometimes called the packers), the same adjoining the stockyards of the Transit Company, and the said parties are the largest purchasers of cattle, calves, hogs and sheep at the stockyards of the Transit Company.

Nelson Morris & Company are the owners and holders of all the shares of the capital stock of the Fairbank Canning Company. The Swifts are the owners of a majority of the shares of the capital stock of Swift & Company, both being corporations organized under the laws of Illinois, and with the establishment of Armour & Company, being the largest and the principal of the slaughtering, packing and·canning plants and establishments in the neighborhood of the stockyards, the vicinity being a portion of the city of Chicago known as Packingtown ; the business· and purchase of cattle and live stock of these three parties representing and constituting, for several years, from fifty-five to sixty per cent. of the whole revenue and income derived by the Transit Company from yardage and charges.

These three parties, Armour & Company, Morris & Company and Swift & Company, have recently purchased, and now control, what are known as the Central stockyards, in Packingtown, adjacent to the yards of the Transit Company, and have constructed and erected on said premises platforms, sheds, pens, railway sidings &c., for the purpose of receiving and distributing among themselves any and all cattle and live stock owned or purchased by them, or directly consigned to them, or either of them, thereby endeavoring to avoid the payment of any yardage or charges to the Transit Company, and had demanded that the Transit Company permit the use of their railroad tracks for the transportation of such cattle and live stock to the Central stockyards without the payment of yardage fees to the Transit Company, and recently commenced three several suits in equity in the circuit court of Cook county, Illinois, against the Transit Company, claiming and demanding as relief that the said court, by order and decree, should compel the Transit Company to

afford facilities over its railroad for the transportation and delivery of any and all cattle and live stock consigned to them, or any of them, or to said Central stockyards, without the payment of the usual yardage and charges thereon theretofore paid by the said parties and collected by the Transit Company.

The said Armour & Company, Morris & Company and Swift & Company have also purchased, and are the owners of, a tract of land at Tolleston, in Indiana, within twenty-five miles of Chicago, consisting of about four thousand acres, which they acquired for the purpose and with the intention, among other things, of locating, establishing and conducting thereon the business of general stockyards for cattle and live stock, with the intention of forthwith removing their entire slaughtering, packing and canning establishments from Packingtown, in Chicago, to the said premises at Tolleston, and of inducing other slaughtering, packing and canning establishments to likewise remove their plants to Tolleston, and have made arrangements to that end, and have entered into negotiations with railroad companies to furnish the required facilities for transportation, to and from said property, of the said cattle and live stock, and have organized a corporation under the laws of New Jersey, under the name of "The Tolleston Stockyards Company," with a capital of $1,000,000, for the purpose of conducting, on one thousand acres of said tract, the business of a general stockyard for cattle and live stock.

Its certificate states that it is incorporated for the purpose, among other things, of acquiring, locating, constructing and maintaining one or more stockyards for cattle and live stock, with all the structures, aqueducts and appliances of every description necessary for the reception, safe-keeping, feeding, trading, delivery and transfer of such stock, and also dead and undressed animals; to erect and establish hotel buildings upon or in proximity to the yards for the convenience of dealers and the public doing business at said yard, and various other purposes incident and convenient to the main purpose of its organization, together with the power to issue bonds and secure the same by pledge or deed of trust upon the property acquired, held

15

or owned by the company, and to sell or pledge such bonds. for proper corporate purposes, and to the extent authorized by law to loan, purchase, hold, sell, assign, mortgage and convey real and personal property of any name and nature.

The disputes between the Transit Company and the packers led to efforts on the part of the Junction Company to effect some settlement and adjustment of the differences. The packers insisted, in view of the large contribution they made to the business of the Transit Company, and which they could save by carrying out their plans, that if they abandoned the same they should be paid the sum of $3,000,000, to be paid in cash or the stock of the Junction Company. Further negotiations were carried on, by which the Junction Company was to obtain certain property and secure valuable business arrangements, and after due consideration the board of directors of the Junction Company, at a meeting thereof, having determined that it was for the best interests of the company so to do, by a resolution of the said board, ordered and directed the officers of the said The Junction Company to make and execute an agreement between the said company of the first part, and Philip D. Armour, Jonathan O. Armour, Philip D. Armour, Jr., and George H. Webster, individually and as copartners, composing the firm of Armour & Company; Nelson Morris, Frank E. Vogel and Edward Morris, individually and as copartners, composing the firm of Nelson Morris & Company; Gustavus F. Swift, Edwin C. Swift, Louis F. Swift and Edward F. Swift, all of the city of Chicago, State of Illinois, and Swift & Company, a corporation of the State of Illinois, as parties of the second part. In pursuance of the said resolution, the president of the Junction Company executed the agreement in the name of the said The Chicago Junction Railways and Union Stockyards Company, and had the same duly attested and delivered in duplicate to or for the benefit of the parties of the second part therein mentioned, but as yet the provisions thereof have not been carried out. The same board which ordered and directed the making and execution of the said agreement is still in power; the members thereof were elected on the 2d day of July, 1891, to serve for a term of one year, and

the said board threatens to carry out the provisions of said agreement, and undoubtedly will, unless prevented.

The recitals of the agreement, the truth of which is admitted by the pleadings, contain the statement of the incorporation of the Junction Company and of its capital stock and the purpose of its organization, so far as relates to the purchase, holding and dealing with the stock of the Transit Company—the incorporation of the Transit Company under the laws of Illinois, with the purposes of its organization—the operations of the Transit Company and its construction of stockyards, plant and railway; that the Junction Company has purchased and acquired and owns one hundred and twenty-nine thousand seven hundred and seventy shares of the stock of the Transit Company; the facts before stated as to the sources and amount of the revenue and income of the Transit Company; that the purchase and acquisition of the shares of the Transit Company were made by the Junction Company with the expectation and belief that the revenue and income of the Transit Company from its business would continue and increase; that the market and demand for cattle and live stock at the yards of the Transit Company, in Chicago, arise from and by reason of the presence of many large slaughtering, packing and canning plants and establishments on premises in the immediate neighborhood and contiguous to said stockyards, known as Packingtown, in that city, and that the largest and principal of such plants and establishments are owned and controlled by the party of the second part to said agreement, whose business at the yards of the Transit Company for several years represented and constituted fifty-five per cent. of the revenue and income derived by the Transit Company from the yardage and charges; the recent purchase by the parties of the second part of the Central stockyards for the purpose before stated, and their demand that the Transit Company permit the use of their railway tracks for the transportation and delivery of cattle and live stock to the Central stockyards, and the commencement of the three suits to obtain the order and decree of the court compelling the Transit Company to afford facilities over its railways for the transportation and delivery of any live stock consigned to either of them, or to the

Central stockyards, without the payment of the usual yardage and charges theretofore paid and collected by the Transit Company; the ownership of the tract at Tolleston, in Indiana, and the purpose of acquiring it, as before stated, the organization of the Tolleston Stockyards Company with the capital and for the purpose before stated; that the parties of the second part have offered to settle their claims and demands against the transit company, as alleged in the three suits; also, to transfer, surrender and convey to it the Central stockyards and all its appurtenances, with all covenants or easements; also, to continue for fifteen years to conduct their several businesses at Chicago, and to purchase cattle and live stock at the yards of the Transit Company and pay yardage and charges for cattle and live stock purchased and owned by or consigned to them; also, to transfer to the New Jersey (the Junction) company all of the shares of the capital stock of the Tolleston company, and to covenant and agree as set forth in the agreement in the terms and for the consideration therein stated; that the removal from the city of Chicago of the said business of the parties of the second part, respectively, would tend to diminish the demand and market for cattle and live stock and shipment thereof to the yards of the Transit Company, so as to result in a large decrease of its business, revenue and income; that if said litigation referred to should be successful there would be a further loss of revenue and income to the Transit Company; that the growth of Chicago, or municipal ordinances, or legislation, or other causes, may thereafter render it necessary and expedient to permanently remove the said stockyards to some less populous centre; that the parties of the second part, although requested so to do, have declined and refused to withdraw the claims and demands made by them in the said suit, or to continue to pay to the Transit Company the yardage and charges on cattle and live stock consigned to them, or to abstain from removing their said establishments to Tolleston, save and except upon the terms and covenants in the agreement specified.

Following these recitals is the agreement containing the following covenants:

"*First.* That the parties of the second part cause to be conveyed to the Transit Company the premises known as the Central stockyards, including all ·of its appurtenances, rights, privileges and easements in fee simple, free and ·clear of all liens and encumbrances; the Transit Company to pay therefor the sum of two hundred and fifty thousand dollars in cash, or at its option a mortgage on the property, payable at any time within ten years, with interest at five per cent.

"*Second.* That said parties of the second part will, within the time specified, ·cause each and all of the said suits to be discontinued and abandoned, or dispose of them in such manner as the Junction Company may reasonably require, ·and that they will not, during the continuance of the agreement, set up against the Transit Company the claim and demand alleged in said suit, nor during that period bring, or cause to be brought, any similar suits at law or in equity ·on any similar claim or demand.

"*Third.* That the parties of the second part, within the time therein named, transfer to the Junction Company certificates for all the shares of the capital stock of the Tolleston company, fully paid and non-assessable, with the covenant that the Tolleston company shall then own in fee simple one ·thousand acres of the land at Tolleston, free from all encumbrances, except the mortgage securing the issue of the two millions of dollars of five per cent. bonds of the Tolleston Stockyards Company.

"*Fourth.* That during the period of fifteen years, unless the Transit Company yards are previously removed from Chicago, the parties of the second part and the Fairbank Canning Company will continue their several business at Packingtown, and that all cattle and live stock slaughtered by either of them, ·on their premises, or within two hundred miles of Chicago, during the said period, shall pass through and use said yards and pay the usual yardage and ·charges.

"*Fifth.* The parties of the second part guarantee that the Transit Company shall receive and collect from its yardage and charges on cattle and live stock, ·owned or consigned to the parties of the second part, or the Fairbank Canning Company, at said yards, the aggregate sum of at least two million dollars within six years, and if it does not, they covenant that they will pay whatever amount may be necessary to make up that sum.

"*Sixth.* The parties of the second part covenant that during the fifteen years they will not permit any portion of the remaining three thousand acres at Tolleston to be used for the purposes of stockyards, or for slaughtering, ·canning or packing-house purposes; that no portion shall be sold without having such a restriction inserted in the deed; that they will grant to the Tolleston company all reasonable easements and connections over the said three thousand acres, in order to enable the one thousand acres to be connected with the neighboring railways, canals or highways; the Tolleston company, as ·the owner of the one thousand acres, on its part, to grant to the parties of the ·second part such easements or connections over the one thousand acres as may ·be reasonably necessary to connect any part of the three thousand acres with the one thousand acres over the neighboring railways, canals and highways.

"*Seventh.* That the parties of the second part, as long as the Transit Company shall conduct the business of a general stockyards on its premises aforesaid,. will not, within the present limits of Chicago, engage in or carry on, or suffer or permit their names to be used in carrying on, the business of stockyards for the general use of the public.

"*Eighth.* That the said parties of the second part, during the term of fifteen years, will not, in Chicago, or any place within two.hundred miles thereof, engage or carry on, or permit their names to be used in carrying on, the business of public or private stockyards.

"*Ninth.* That the Junction Company, on its part, agrees to pay, at the time therein named, to the parties of the second part, the sum of seven hundred and fifty thousand dollars in cash or in shares of its present capital stock, or partly in cash and partly in shares, at its option, such shares to be held by the parties of the second part for five years; also to guarantee the payment of principal and interest of the two million dollars in bonds of the Tolleston company—the form and provisions of which bond, and the mortgage to secure the· same, being particularly specified in said ninth and tenth covenants.

"*Eleventh.* That the one thousand acres at Tolleston shall be in one block,. with certain provisions with reference to the designation of easements and settlements of dispute.

"*Twelfth.* Is for the execution of further assurance and other incidental. matters."

The parties of the second part to said agreement have given to the Junction Company the option, if it so desires, to have the one thousand acres of land at Tolleston, referred to in said agreement, with its appurtenances and easements, conveyed to the Junction Company directly, and of issuing and delivering to the parties of the second part to the said contract $2,000,000 of five per cent. fifteen-year bonds of the Junction Company, secured by a purchase-money mortgage on said one thousand acres, instead of having said one thousand acres conveyed to the Tolleston. company, and of guaranteeing the bonds of such latter company as provided in the said original contract, which option is still; in force.

The bill charges that the said agreement

" Is not within the powers and franchises of the Junction Company to make,. and that such agreement is *ultra vires* the corporation, and that the carrying· out of the same would be a perversion of the franchises and privileges of the· said corporation, and the creation of debts and liabilities on the part of said corporation, and the payment of moneys contrary to the rights of the stock-. holders and to law and equity."

Answers were filed by the Junction Company, and by Armour & Company, Morris & Company, and Swift & Company, and the hearing was on bill and answers.

*Mr. Joseph D. Bedle,* for the complainant.

*Mr. Cortlandt Parker* (*Mr. William D. Guthrie* and *Mr. Clarence A. Seward,* of the New York bar, with him), for the Junction Company.

*Mr. Cortlandt Parker, Jr.,* and *Mr. Barker Gummere,* for Armour & Company, Nelson Morris & Company, and Swift & Company.

GREEN, V. C.

The bill is filed by a stockholder in behalf of himself and any other applying stockholders against the corporation to prevent its carrying a contract, made by the directors, into execution, on the ground that the same is not legally within the powers conferred by its charter. No question is raised as to the validity of the organization, or the legality of the purposes stated in the certificate of incorporation as not contemplated by the Corporation act, if, indeed, such questions could be raised by a private person in this court. *National Docks Co.* v. *Central R. R. Co., 5 Stew. Eq. 755; Elizabethtown Gas Light Co.* v. *Green, 1 Dick. Ch. Rep. 118.* He appeals not through or by the attorney-general, but bases his claim for relief solely upon his ownership of certain shares of the stock of the Junction Company. The theory of the suit is, that the agreement will be an injury, primarily, to the company and, incidentally, to him as a stockholder; that appeal to the present directors to protect the company and stockholders will be futile, as they have decided otherwise, and, therefore, he asks to be permitted to act for himself and others in like position. The only damages with which complainant, as a stockholder, can be threatened are to the security of his investment, and to the dividends he expects to receive—whether the latter is imminent depends mainly upon the probable results of the arrange-

ment challenged, as a business operation. As a holder of preferred stock, his fixed yearly dividend is secured by the articles of incorporation, while the dividend on his common stock must depend on the success of the business and the action of the directors, for such dividends may be lawfully diminished if the diversion of the same be for a purpose which is within the corporate powers, unless the non-declaration of them be in fraud of the rights of the stockholders. *Beach Corp. p. 601.* Nor is his right to challenge action which he may deem dangerous to his investment absolute. Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation, and, in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint. To hold otherwise would be to substitute the judgment and discretion of others in the place of those determined on by the scheme of incorporation. *Park* v. *Grant Locomotive Works, 13 Stew. Eq. 114; affirmed, 18 Stew. Eq. 244; Elkins* v. *Camden and Atlantic R. R. Co., 9 Stew. Eq. 241; Rutland and B. R. Co.* v. *Proctor, 29 Vt. 93; Morawetz Corp.* § *243; Beach Corp. p. 388.*

By the Corporation act (*Rev. p. 177 § 1 ¶ 6*) power is given to corporations to make by-laws for the regulation and government of its affairs.

By the by-laws of the Junction Company, article 2, section 1, it is provided that the business of the company shall be managed and conducted by a board of ten directors.

The bill alleges that the board of directors of the Junction Company did, by a resolution, order and direct the execution of the contract in question, and the answer of the company states that each and every director of the company has voted in favor of the agreement as being for the best interests of the company.

Ellerman *v.* Chicago Junction Railways &c. Co.

The agreement, then, has the unanimous sanction of the board ·of directors, to whose judgment and determination the management and control of the affairs of the company has been entrusted without restriction.

If the prudence of the contract were open to question by the complainant, a moment's consideration of the condition of affairs would demonstrate not only its advantages to both parties, but that it was well-nigh vital to the interests of the Transit Company, and of the Junction Company, its principal stockholder.

The directors were confronted with the fact that the extensive and remunerative business of the Transit Company, at its stockyards, was threatened with the loss of the custom of its principal patrons; that these parties whose business had contributed from fifty to sixty per cent. of the earnings of the transit company, representing annually over $850,000 of profits, were not only about to withdraw their trade to their own yards, limited in capacity, but were engaged in preparations to establish a general plant on an extensive scale at Tolleston, only twenty-five miles distant.  They must have known that this was a move which was dictated not only by business motives, but from well-founded apprehension that sooner or later interference by state or municipal legislation with the continuance of stockyard business in the limits of the city of Chicago was to be expected, action which, of course, threatened the business of the packers and of the Transit Company at their respective stockyards alike, and which would result not only in incalculable injury to the plant, but would be ruinous to the business if prudent foresight did not prearrange for its continuance elsewhere.  Whether such adverse legislation was passed or not, the packers, by their suits, sought to enforce the performance of alleged duties, which, it was claimed, the Transit Company, as a carrier, owed to the public.  We cannot say that a decision adverse to the company in these cases might not be reasonably apprehended by the directors, a result by which they would have been forced to contribute the use of their facilities of transportation to the carrying on of a rival establishment.  The development of such conditions could mean nothing but damage to the property and business of the company,

and, of course, loss to the stockholders. On the other hand, the prosecution of the plan by the packers would have made it necessary for them to have expended a vast amount of money to carry it to a successful conclusion, and have added the management of another line of business to their already comprehensive enterprise.

This situation of affairs led to negotiations between the parties to arrive, if possible, at a harmonious and reasonable settlement of the matters in dispute, and, after such negotiations, the directors, being of opinion that it was for the best interests of the company that the adjustment should be made on the basis of the agreement, directed its execution.

Stated concisely, the provisions of the contract and the covenants are:

*First.* The Central stockyards are purchased for $250,000.

*Second.* The suits involving the railroad connections and facilities are settled.

*Third.* The Junction Company buys all the stock of the Tolleston company.

*Fourth.* Armour & Company, Morris & Company and Swift & Company agree that all their business for fifteen years shall pass through the yards of the Transit Company, unless they are previously removed.

*Fifth.* The same parties covenant that their business in yardage and charges at said yards shall produce at least $2,000,000 during the next six years.

*Sixth.* They agree that for fifteen years the land they bought at Tolleston and did not sell to the Tolleston company shall not be used for stockyard purposes.

*Seventh.* They agree that so long as the Transit Company shall conduct its business on its premises in Chicago, they will not, directly or indirectly, carry on *there* the business of stockyards for the general use of the public.

*Eighth.* That for fifteen years they will not, directly or indirectly, engage in or carry on the business of public or private stockyards in Chicago, or within two hundred miles thereof.

The Junction Company contracts for the conveyance to the Transit Company of the Central stockyards, and the payment therefor, by the Transit Company, of $250,000 in cash or by a consideration mortgage.

*Second.* That the Junction Company will buy the stock of the Tolleston company at par, that company to possess one thousand acres of land selected from the four thousand acres, with easements and connections over the remaining three thousand acres.

*Third.* That as a price of the whole thing, and compensation for all which it gets, other than the Central stockyards, it will pay $750,000, in cash or stock, and will guarantee the bonds of the Tolleston company, whose stock it buys to the amount of $2,000,000, the same being secured by the mortgage of that company; or, at its option, take the title to the one thousand acres and issue its own bonds for $2,000,000 to the parties of the second part.

The present payment by the Junction Company proper, it will be observed, is limited to $750,000, the payment for the Central stockyards being provided for by the Transit Company, to which said yards are to be conveyed.

The consideration of the contract is not to be arrived at by a disintegration and appraisement of its separate parts; it is essentially an entirety; it is agreed to as a whole; it recites that the parties of the second part had declined and refused to enter into the covenants imposed upon them except on the terms and conditions specified in the agreement.

The answer of the company says the consideration moving the defendant and to be received by it for its execution of the agreement was, in the unanimous opinion of the directors of the defendant, equal to at least the sum of $3,000,000, without regard to the value of the shares of the capital stock of the Tolleston company, or to the great benefit and advantage which might result if the said stockyards were ultimately compelled to remove from the said city of Chicago; and said directors believed that the covenants to continue in business, to deal exclusively at said stockyards and to abandon all the claims in said suits, were, of themselves, ample and sufficient consideration for said sum of

$3,000,000, and that such consideration therefor was, under the facts and circumstances therein stated, just and equitable, and was proportionate to the consideration agreed to be paid by it for the transfer of the property, and the covenants therein specified and contained.

The answer of Armour & Company, Morris & Company and Swift & Company, while admitting that the value of the Central stockyards does not exceed $250,000, and that the value of the one thousand acres of land at Tolleston does not exceed $1,000,000, aver that, in their judgment, said properties, taken in connection with the privileges, easements and covenants recited in said agreements, are fully worth to them what is agreed to be paid therefor, and would, in their opinion, realize to them large profits if they did not sell the same and continued their proposed enterprise.

But the question of adequacy of the consideration received by the company for what it agreed to pay is one which is not open to the plaintiff. So long as the consideration was valuable, and not so inadequate as to impute fraud, the amount to be paid was in the discretion of the board of directors and will not be inquired into by the court.

All of these considerations moving to the company are what the law denominates valuable; the lands and the easements were valuable, the compromise of the suits was valuable, the agreement to secure the $2,000,000 in business was valuable, the agreement not to commence a rival business within a restricted territory and for a given term was also valuable. All these considerations moving from the party of the second part were in law a unity, and for such unity they were to be paid the amount agreed on. The law will not, because it cannot, apportion that amount to and among the realty, compromise and covenants. It cannot apply the consideration distributively to the several obligations of the parties of the second part. The consideration to the company for its promises was the obligations generally of the parties of the second part.

The terms of the contract and the consideration having then been settled by the directors, on what ground is it attacked?

There is no intimation of fraud—no improvidence is alleged, no extravagance, no absence of occasion moving such a contract, no allegation of haste or of mistake of facts; nothing is alleged but error in law on the part of the directors who unanimously approved the agreement.

The legal presumption is in favor of the validity of the agreement. "If it is not, on its face, necessarily beyond the scope of the power of the corporation by which it was made, it will, in the absence of proof to the contrary, be presumed to be valid. Corporations are presumed to contract within their powers." *Railway Co.* v. *McCarthy, 96 U. S. 267.* The law will not presume an agreement to be invalid which is capable of a construction which will make it valid. *Curtis* v. *Gokey, 68 N. Y. 300, 304; Ormes* v. *Dauchy, 82 N. Y. 443, 448.* The burden is upon the complainant to demonstrate that the agreement was beyond the corporate powers, and to show how and where the legal restraint arises, or was imposed, which rendered the contract *ultra vires.* The rule is thus stated in *Wood's Railw. L. 526 :*

"All contracts of a corporation which are not contrary to the express provisions of their charter or the general law, are presumed to be within their powers, and the burden is upon those who seek to invalidate them, to show the elements which render them *ultra vires.*"

In *Shrewsbury Co.* v. *Northwest Co., 6 H. L. Cas. 113, 125,* Lord Cranworth said : *"Prima facie* a corporation may contract under seal. You must show that the particular contract is one which the corporation has no power to enter into. It must be shown on the face of it to be a breach of duty—something foreign to the object for which the company was established."

In *Scottish Co.* v. *Stewart, 3 Macq. H. L. Cas. 382,* Lord Wensleydale said : "There can be no doubt that a corporation is fully capable of binding itself by any contract under its common seal, except when the statute, by which it is created or regulated, expressly or by necessary implication prohibits such contract between the parties. *Prima facie* all its contracts are valid, and it lies on those who impeach any contract to make out that it is void."

In *Elkins* v. *Camden and Atlantic R. R. Co.*, *9 Stew. Eq. 241*, *242*, Vice-Chancellor Van Fleet says: " The courts will, as a general rule, presume that contracts made by a railway corporation, which appear to be designed to promote its legitimate and profitable operation, are within the limits of the powers, and, if their validity be assailed, will require the assailant to assume the burden of demonstrating that fact."

The charge of the complainant is, that—

" the said contract is not within the power and franchise of the Junction Company to make, and that such agreement is *ultra vires* the corporation, and that the carrying out of the same would be a perversion of the franchises and privileges of the corporation, and the creation of debts and liabilities on the part of the said corporation, and the payment of moneys contrary to the rights of the stockholders, and to law and equity."

The prayer is that the said agreement may be decreed as not within the powers and franchises of the Junction Company and null and void.

The powers of the company involved in this controversy, as ascertained from the third paragraph of the certificate, are (1) to purchase, hold, pledge, transfer, sell or otherwise dispose of or deal in shares of the capital stock of the Transit Company ; (3) to exercise in respect to said shares any and all the rights, powers and privileges of owners of shares of said capital stock ; (5) to do any and all acts and things tending to increase the value of the shares of the capital stock of said company ; (7) and in the promotion of its corporate business, to purchase, receive, hold and dispose of any securities of any person or corporation, whether such securities shall be bonds, mortgages, debentures, notes or shares of capital stock, and in respect of any such securities, to exercise all and any of the rights and privileges of owners thereof, and to the extent authorized by law to lease, purchase, hold, sell, assign, mortgage and convey real and personal property of any name and nature.

As I understand, the learned counsel of the complainant, in his argument, insists that the agreement does not come fairly within any part of paragraph 3 of the certificate, which can be

·considered as a statement of objects within the contemplation of the law.

The argument is that the clauses " to exercise in respect to said shares the rights, powers and privileges of owners of the stock," and "to do any acts and things tending to increase the value of the shares," read in connection with that authorizing the company to deal in said stock, confines the operations of the company to transactions in the shares of stock as such ; that as owner of the stock it has the power to exercise with respect thereto the rights of owners without any such declaration, and that the clauses relating to the doing of any act tending to increase the value of the stock, if not limited to the handling and operation of shares in dealing therein, is too indefinite to be considered as the proper statement of an object of the corporation. This contention limits the objects of the Junction Company practically to the buying and selling of the stock of the Transit Company. This, it seems to me, is too narrow a construction. If such were alone the object of the promoters of the company, there would be no occasion to incorporate for such purpose, or, if they did so, to have done more than use the first subdivision of paragraph 3. The general object of the corporation is to be gathered not from any one of the specifications, but from the whole of the paragraph. It is not simply to deal in the Transit Company's stock, but to own and hold it, and to increase its value not by operations in the market, but by the exercise of auxiliary corporate acts which possibly it was not within the power of the Transit Company to exercise. It is said that a statement to do any and all acts tending to increase the value of the stock is too indefinite to be considered as the statement of an object of incorporation, as required by the statute ; that there must be something specific stated, and it is asked, can such recital really confer any corporate power ? And, if so, what is the limit of its exercise ? If it was a declaration of power to do any and all acts tending to increase the value of its own stock, it would certainly be without effect. *Re Crown Bank, 44 Ch. D. 634.* It would be either surplusage, or else too indefinite to be considered as a statement of a purpose as required by law, because, *first*, so far

as any authorized acts are concerned, the company would possess-
the right to do them without such statement, and, *second*, it
could confer no other powers, because the law requiring the
objects to be named must mean they should at least be indicated ;-
but here the stock referred to, to be benefited, is not the stock of
the Junction Company, but the stock of another, namely, the-
Transit Company ; the statement is that the Junction Company
shall have the power to do acts tending to increase the value of
the stock, not its own, but that of the Transit Company, and it
seems to me that such clause may be fairly construed to authorize-
such acts, tending to increase the value of that stock, as fall-
within recognized lawful corporate powers—those not against the-
policy of the law, which are germane to the general purposes of
the corporation, and are specially enumerated in the certificate, or
are incident thereto. *Simpson* v. *Westminster P. H. Co.*, *8 H. L.
Cas. 712 ; Peruvian Railways Co.* v. *Ins. Co., L. R. (2 Ch. Div.)
617 ; Studdert* v. *Grosvenor, 33 Ch. Div. 528, 538 ; Henderson* v.
*Bank, 40 Ch. Div. 170.* The recital in the certificate anticipates-
and answers the question and objection asked and urged by the
complainant, viz. : how can the funds of the Junction Company
be used for the direct benefit of the stock of another, namely, the-
Transit Company, and only indirectly to the benefit of the Junc-
tion Company as a stockholder of the company directly bene-
fited ? For such recital expressly confers such power.

What limitation is then to be applied to the powers sought to-
be secured by subdivisions 3 and 5 of paragraph 3, and can the-
agreement be brought within the provisions of the general Cor-
poration act or the specifications of the certificate ? The general-
act gives to all corporations general corporate powers and all
others necessary to their exercise. If these were not sufficient
to effect the objects of the corporation, recourse was formerly-
had to the legislature for a specific grant of power. The consti-
tution providing that "the legislature shall pass no special act-
conferring corporate powers, but shall pass general laws under-
which corporations may be organized and corporate powers of
every nature obtained," and the general Corporation act being,-
as it now stands, passed in obedience to the mandate of the con-

stitution, the certificate required by that act becomes the charter
of the company, and the equivalent of the former special act of
the legislature.     *Ashbury Co.* v. *Riche, L. R.* (*7 Eng. & I. Ap.*)
*653; Guinness* v. *Land Corp., L. R.* (*22 Ch. Div.*) *349, 357.*
As amended, the Corporation act permits incorporations not only
for objects specified therein but for "any lawful business or pur-
pose whatsoever," which general clause is not, however, to be
construed as embracing powers to do those things which would
deprive the corporation of its ability to carry out the objects for
which it was formed, or discharge any duties which it might
under its charter owe to the public, or which are contrary to the
policy of the law.    *Oregon Ry. Co.* v. *Oregonian Ry. Co., 130
U. S. 1.*

By the statement, therefore, in the certificate of incorporation of
the desired powers under the head of objects of the corporation,
the special powers are obtained, and, as incident thereto, such
others as may be necessary for their exercise.   So that the Gen-
eral Corporation act confers on the company certain powers, the
certificate contemplates others, and incidental powers follow not
only with respect of the general but also of the special powers.

The learned counsel strongly presses the provisions of section
3 of the Corporation act, as follows :

"In addition to the powers enumerated in the first section of this act and to
those expressly given in its charter or certificate under which it is or shall be
incorporated, no corporation shall possess or exercise any corporate powers
except such as shall be necessary to the exercise of the powers so enumerated
and given."

The construction to be given to the words "necessary to the
exercise" is settled in this state.   Chief-Justice Beasley, deliver-
ing the opinion of the court of errors and appeals in *State, R. R.
Co.* v. *Hancock, 6 Vr. 537* (at *p. 545*), says : "Power necessary
to a corporation does not mean simply power which is indispensi-
ble."    *Page 546 :* "A power which is obviously appropriate and
convenient to carry into effect the franchise granted has always
been deemed a necessary one."    *Page 547 :* "In short, the term
comprises a grant of the right to use all the means suitable and

16

proper to accomplish the end which the legislature had in view at the time of the enactment of the charter." *McCulloch* v. *Maryland, 4 Wheat. 316, 414; Olmsted* v. *Morris Aqueduct, 18 Vr. 311; Crawford* v. *Longstreet, 14 Vr. 325; Morris Canal* v. *Love, 8 Vr. 63.*

. While it is true that when the state challenges the action of one of its corporate creations it may insist on a clear warrant for its action (*Ch., R. I. & P. R. R.* v. *Union Pacific Co., 47 Fed. Rep. 15,* the application of the doctrine of *ultra vires* to the acts of a corporation in suits by individuals is not by an inflexible rule—it yields not only to necessity, but to transactions incidental to prescribed powers. Lord-Justice James, in *Attorney-General* v. *Great Eastern Ry., 11 Ch. D. 449, 479,* held that the arrangement attacked was "a reasonable and proper, and therefore legitimate, incident of the proper business" of the company. In same case on appeal (*5 App. Cas. 473*) Lord-Chancellor Selbourne said : " I agree with Lord-Justice•James that this doctrine (*ultra vires*) ought to be reasonably, and not unreasonably, understood and applied, and that whatever may be fairly regarded as incidental to, and consequential upon, those things which the legislature has authorized, ought not (unless expressly prohibited) to be held by judicial construction to be *ultra vires.*"

Lord St. Leonards, in *Eastern Counties Railway* v. *Hawkes, 5 H. L. Cas. 331* (at *p. 380*), says : " I trust that this decision and the decisions of this house during the present session     *     *     * will place the powers and liabilities of directors and their companies in making contracts and in dealing with third parties upon a safe and rational footing. They do not authorize directors to bind their companies by contracts foreign to the purposes for which they were established, but they do hold companies bound by contracts duly entered into by their directors for purposes which they have treated as within the objects of their acts and which cannot clearly be shown not to fall within them."

*1 Morawetz Priv. Corp. § 362* says :

"It is a well-established general rule that a corporation may carry on the business for which it was chartered in the manner in which a business of that particular kind is usually carried on. What the·usual manner of carrying on

Ellerman *v.* Chicago Junction Railways &c. Co.

a business is cannot be determined by the application of purely legal principles; it is a question of fact, and not a question of law. Evidently, therefore, it is impossible to decide abstractly that acts of a particular description are within or without the chartered powers of a corporation. The right of a corporation to perform an act depends, in every case, upon all the surrounding circumstances; no act is authorized under all circumstances, and facts can be conceived which would render almost any act justifiable. Thus, a railroad company may usually buy coal and material for constructing its road, but it would have no authority to buy coal or anything else as a speculation, with the intention of selling it again. On the other hand, it would clearly be unauthorized, under any ordinary state of facts, to use the funds of a railroad company for building a church or a theatre; yet this use of the corporate funds might be entirely justifiable, if a church or a theatre were required for the use of the company's workmen in a part of the world where no church or suitable place of recreation was accessible."

Applying these principles, we proceed to examine the contract in detail with reference to the question whether it is within the chartered powers of the corporation.

The action of the directors is their determination that the ends obtained will tend to increase the value of the transit stock.

It should be borne in mind that the Junction Company is a trading corporation not engaged in any public business or owing any public duty or exercising any franchise of eminent domain. Its operations under its charter might be entirely suspended without detriment to a single public interest, and it would seem that in the making of this agreement all that was involved was the partnership relation between the shareholders of a company.

### CENTRAL STOCKYARDS.

We have first the purchase of the Central stockyards, which are to be conveyed to the Transit Company, for which $250,000 is to be paid either in cash or secured, partly or wholly, by a mortgage.

It can scarcely be pretended that the purchase of the Central stockyards is *ultra vires* either of the Transit Company, which takes the title, or of the Junction Company, which owns the

stock of the Transit Company and which contracts in this regard
as a stockholder.

The agreement to purchase the Central stockyards for the
Transit Company had a direct tendency to increase the value of
its shares, for it added a new asset to the previous assets of that
company.

The purchase of adjoining property devoted to like use is but
an extension of the domain and the business of the Transit
Company.

By section 2 of the charter of the Transit Company power is
conferred on that corporation to purchase lands for the purposes
of its stockyard business within prescribed limits. The covenant
in question is for the purchase of just such land and for just such
a purpose and within those limits. It is therefore within the
powers of the Transit Company. There is no pretence that the
purchase of the stockyards property is for the purpose of hold-
ing the same for speculation or sale, or for any purpose or use
whatever inconsistent with the corporate business and powers of
the corporation, or that any use of the same is contemplated in-
consistent with either of their corporate powers or duties.

The Junction Company, though under no obligation to do so,
might lawfully pay the purchase-money, for, through its stock,
it would receive an immediate equivalent therefor in the increase
of the assets of the Transit Company.

It is argued, however, that as the Junction Company is the
owner of only one hundred and twenty-nine thousand seven
hundred and seventy shares of the one hundred and thirty-two
thousand shares of the Transit Company, that the expenditure
of the funds of the Junction Company will enhance the value of
the remaining two thousand two hundred and thirty shares of
the Transit Company without the owner thereof contributing
anything to such increased value.

If the expenditure was to be made for a benefit which would
accrue only to the holders of the other shares, there would be
force in the suggestion, but the argument itself is based on the
assumption that by the transaction the value of the stock is to
be increased, and if the value of the two thousand two hundred

and thirty shares is increased by carrying the contract into effect, by the same ratio will the holdings of the company be increased.

In *Sutro Tunnel* v. *Segregated B. M. Co., 7 Pac. Rep. 271,* a mining company agreed to pay to the tunnel company so much per foot of the tunnel constructed. The work would facilitate the draining of the mining company's mine. This would be an appropriation of company's funds to the construction of the works of another. Held not *ultra vires,* as the company received the benefit of the expenditure.

It is immaterial if the benefit is directly or indirectly received. In *Ch., R. I. & P. R. R.* v. *Union Pacific Co., 47 Fed. Rep. 15,* it was objected, on behalf of the Omaha railroad, that the contract provided that the Rock Island should pay to the Union Pacific the rental for the use of the Omaha's line. Justice Brewer says: "The Union Pacific owns substantially all the stock of the Omaha, and a contract by a company that the rental for the partial use of its property shall be paid directly to the stockholders instead of to the company, surely cannot be declared beyond the power of the corporation."

### PURCHASE OF THE TOLLESTON STOCK.

The Junction Company has express power by its articles of organization, paragraph 3, subdivision 7, in the promotion of its corporate business "to buy, hold and dispose of any securities of any person or corporation whether such securities shall be bonds * * * or shares of stock, and in respect to any such securities to exercise any and all the rights and privileges of owners thereof."

The corporate business of the Junction Company being to deal in stock of the Transit Company, and to do anything authorized by its charter to increase its value, and being, as above, authorized to buy the stock of any corporation, the buying of the stock of an intended rival, with the probable intent to use the purchase for the extension of the Transit Company's business, and with the certain effect of preventing the depreciation of that company's

stock, is certainly within the powers contemplated by the certificate of the Junction Company.

The tendency and intent of the contract is to raise or preserve, which is the same thing, the value of the capital stock of the Transit Company, the capital in trade of the Junction Company.

Buying this stock is within the chartered powers, because it tends to preserve the value of the Transit Company's stock and to afford the Transit Company an opportunity for the enlargement of business, and because the Junction Company has the right under the charter, in its corporate business, to buy the stock of any other company.

Again, by the purchase of the capital stock of the Tolleston company, the Junction Company became practically the owner in fee simple of one thousand acres of land in Tolleston, with valuable easements over the adjoining lands, free from all lien and encumbrances, except a mortgage lien to secure $2,000,000 of five per cent. first mortgage bonds of that corporation. This covenant is in substance and effect a covenant on the part of the Junction Company to purchase one thousand acres of land and easements, together with all the corporate privileges of the Tolleston company, for the purpose of using the same as a general stockyards for yarding &c. cattle and live stock.

The Junction Company has, however, the option to have the one thousand acres conveyed directly to it, which is within the express terms of the certificate.

### GUARANTEE OF THE TOLLESTON BONDS.

The obligation to guarantee the payment of $2,000,000 of the Tolleston company's bonds is, in view of the existing option, to issue the Junction Company's bonds direct, instead of making such guarantee, of less moment than it would have been if such option did not exist. Was it, however, a lawful undertaking?

The Junction Company was authorized by its charter to issue its own bonds, and by it, and by section 4 of the Corporation act, to mortgage its real estate. It was also authorized by its charter to receive and dispose of any securities of any corpora-

tion, whether bonds or otherwise, and in respect thereto to exercise all of the rights and privileges of the individual owners thereof. Having such powers, it could lawfully do what the individual owners thereof might do.

The parties of the second part were the owners of the one thousand acres of land which are to be conveyed to the Tolleston company. They were also the owners of all the stock of the Tolleston company and the owners of all the bonds issued by such company. They were grantors, stockholders and creditors, and they were all the creditors. Those parties had a right to estimate the value of the one thousand acres, as between themselves and their own stock, at such value as they pleased, and to secure the payment of such value by such lawful means as they chose to adopt. *Lorillard* v. *Clyde, 86 N. Y. 387.*

The amount of the bonds to be guaranteed represents so much of the consideration to be given by the Junction Company for all it is to receive under the contract. As stated, it could, under its charter, pay the amount by the issue of its own bonds. If, as part of its purchase, it received the bonds of the Tolleston company, it could pay them to the parties of the second part as payment *pro tanto* of the consideration—its own debt. In doing this, it would be authorized under the authorities to guarantee the payment of the bonds. *Railroad Co.* v. *Howard, 7 Wall. 392; Rogers Locomotive Works* v. *S. R. R. Assn., 34 Fed. Rep. 278; Low* v. *Central Pacific R. R. Co., 52 Cal. 53; Opdyke* v. *Pacific R. R., 3 Dill. C. C. 55; Arnot* v. *Erie R. R. Co., 5 Hun 608; Madison &c. R. R. Co.* v. *Nor. Sav. Society, 24 Ind. 457.* By guaranteeing the bonds, and the packers taking the guarantee as part payment of the consideration, the same result is reached without circumlocution, and, so far as its legality is concerned, mere routine of action cannot be material.

By this means, instead of paying the money itself, which might have been required, it gains a credit for all the years during which these bonds have to run; instead of pledging its own credit directly, as by issuing its own bonds, or debentures, or notes, it lets the Tolleston company remain the principal debtor, while it assumes the formal position of surety. If it received no

consideration and was only guaranteeing for the accommodation of the Tolleston company, in which it had no interest, the contract would be *ultra vires* and void—it would be a fraud on the stockholders; but given as part of the consideration, the transaction amounts simply to this: the packers did not exact money, nor even the bonds of the Junction Company for the money; they agreed to accept the direct promise of the Tolleston company, secured by its mortgage, and a conditional agreement of the Junction Company that the promise should be kept. It is just as lawful for the corporation to give a conditional contract to its creditor to pay him money as it is to give him a contract to pay directly and without provision. It is the business of the creditor to determine whether he will take one or the other. Both are equally binding if there is consideration for them. The form of the contract is nothing. The whole question turns on the consideration.

Again, the substance and effect of the covenants are, that the Junction Company buys of the packers one thousand acres of land at Tolleston for stockyards, subject to a mortgage securing the payment of $2,000,000 of bonds, together with the easements for the benefit of said land over three thousand acres of land immediately adjoining, owned by the packers, and guarantees therefor the payment of the $2,000,000 of bonds, and in equity such guarantee is nothing more than an assumption of a mortgage debt existing upon the land, which the Junction Company, in the exercise of power clearly specified in its charter, has purchased for use as a stockyard.

But there can be no question that under the power contained in the third clause of its charter, "to purchase, mortgage and convey the said real property, easements and appurtenances," the Junction Company may exercise its option and take the conveyance for the said one thousand acres of land at Tolleston, with its appurtenances and easements, by direct conveyance to itself, and issue and deliver to the packers the $2,000,000 five per cent. fifteen-year bonds of said corporation, secured by a purchase-money mortgage on the said one thousand acres, with its appurtenances and easements.

It is said that the value of the land is so disproportionate to ·the amount to be paid and the liability incurred as to dispel any idea of purchase. The error of this argument lies in the fact that it ignores the entirety of the contract, and loses sight of the ·covenants for business guaranteed to produce $2,000,000 in six years, the agreements not to enter into competitive business for fifteen years and the other benefits secured, and as to the adequacy of the consideration of which covenants the court will not inquire.    *Curtis* v. *Gokey, 68 N. Y. 300; Hitchcock* v. *Coker,* ·6 *Ad. & E. 438; Archer* v. *Marsh, 6 Ad. & E. 959; Leighton* v. *Wales, 3 Mees. & W. 545; Pilkington* v. *Scott, 15 Mees. & W. 657; Sainter* v. *Ferguson, 7 Com. B. 716; Graveley* v. *Barnard, L. R. (18 Eq. Cas.) 521;* and cases cited *92 Am. Dec. 754 n.*

The foregoing embrace the covenants of the Junction Company, ·except the payment of the $750,000.    Question is made as to the corporate right to expend the money of the company for the purposes covered by the contract.    It is asked, can this money be used " to virtually swallow up another corporation ? "    " Did ·the stockholders of the Junction Company subscribe to or take their stock under any possible thought that the Junction Com,pany was, in fact, to operate the Transit Company and pay out its money and create its liabilities for the benefit of the Transit Company as such ? "    The contract does not contemplate that the ·Junction Company is to operate the Transit Company.    There is no amalgamation or consolidation of the companies—each pre·serves its own organization and manages its own affairs by its own ·officers—neither of them part with any element of their powers, ·or deprive themselves of their ability to discharge their corporate ·duties and exercise their franchises.    The Junction Company is a stockholder, and contracts as a stockholder, and must carry out its contract as such.    That it can be such stockholder, without limitation as to amount, is provided for by the certificate, and is the fundamental purpose of its being.    The stockholders are presumed to have taken their shares with full notice that the funds of the company might be expended for any object contem,plated by its certificate of incorporation, and it expressly con-

templates the doing of those things which tend to increase the value of the stock of the Transit Company.

The covenants considered seem to be covered by the provisions of the certificate, or fairly incidental thereto. There remain two other elements of the contract which form part of the considera-- tion for the expenditure of the money of the company, both of which are apparently for the benefit of the stock of the Transit Company, viz., the provisions for the compromise of the suits and for non-competition. Neither of these objects are referable to any specification in the certificate, but they are powers inci- dent to corporate management and business.

The Junction Company may lawfully compromise the suits against the Transit Company and use the company's funds for this purpose. *Brice U. V. (2d Eng. ed.) 609* says :

"Lastly there is a compromise of dispute. This may come into play in connection with two distinct classes of matters—ordinary disputes as to the construction &c. of contracts, and as to the rights and liabilities in respect thereof, and of other matters ; and disputes as to the position of shareholders, and as to their rights and liabilities. As to the former class of matters, prob-- ably it may be laid down without qualification that the capacity to settle these must be incident to every form of general agency for corporations, and that, . therefore, governing bodies not positively restricted therefrom may compro- mise all such disputes."

*Morawetz Priv. Corp. § 424* says :

"There can be no doubt that any corporation may enter into a compromise,. and the payment of a claim by the agents of a corporation in good faith, for the purpose of avoiding litigation, will not be held unauthorized merely because the claim was not a just one."

In *First National Bank* v. *National Exchange Bank, 92 U. S. 122* (at *p. 127*), the court says : "Compromise to avoid or reduce losses are oftentimes the necessary results of this con- dition of things. These compromises come within the general scope of the powers committed to the board of directors and the officers and agents of the bank, and are submitted to their judg- ment and discretion, except to the extent that they are re- strained by the charter or by-laws. Banks may do in this

behalf whatever natural persons could do under like circumstances." * * * At *page 128:* " In the honest exercise of the power to compromise a doubtful debt owing to a bank, it can hardly be doubted that stocks may be accepted in payment and satisfaction, with the view to their subsequent sale or conversion into money so as to make good or reduce an anticipated loss. * * * It is difficult to see how a debt due from, or a contested obligation resting upon a bank, occupies any different position in respect to this power of adjustment and compromise from that of a debt owing to it. The object in both cases is to get rid of or reduce an apprehended loss growing out of legitimate business, and it would seem that whatever might be done in the one case ought not to be excluded from the other under the same circumstances."

*New Albany* v. *Burke, 11 Wall. 96.* The city subscribed for stock of a railroad company and issued bonds. The validity of the bonds was denied by the taxpayers, who filed bills against them. The company had pledged the bonds to creditors. The company applied to the city to pay the sums due, take back the bonds pledged and be discharged from the issue of the balance of the bonds not issued, and this was effected. The purchaser of a judgment against the company, on execution returned unsatisfied, filed a bill against the city, alleging that the compromise was illegal. It was held that the transansaction was not invalid. The court said (at *p. 105*) that the complainants could " have no standing in court unless the arrangement was absolutely null for want of power in the parties to make it, or unless it was fraudulent as against them, and therefore voidable at their suit," and " that the common council were free to exercise their own discretion." It is even held that if the result be the promotion of the welfare of the company, the directors may lawfully secure such result by a gratuitous disbursement of the company's funds and property. *Hampson* v. *Prices Co., 45 L. J. (N. S.) Ch. 437; Taunton* v. *Royal Insurance Co.; 33 L. J. (N. S.) Eq. 406; 2 H. & M. 135; Wheatstone* v. *Ottawa University, 13 Kan. 320; Vandell* v. *S. S. F. Dock Co., 40 Cal. 84; Sherman Co.* v. *Russell, 26 Pac. Rep. 715.*

The non-competition was but an incident subsequent to the :affirmative agreement to remain the customers and patrons of the transit company, but if the purpose of the agreement had been the prevention of competition, such a purpose would have been lawful. In *Eastern Counties Ry.* v. *Hawkes, 5 H. L. Cas. 331,* Lord St. Leonards (at *p. 371*) said : " Where directors are acting in the obvious line of duty, as in this case, buying off an opposition, and acquiring property necessary or useful for the corporation, and the party contracting with such directors is not :aware of any intended misapplication on their part, I am of opinion that the contract is binding, although it can afterwards be shown that the property really was not required for the railway. The safety of men in their daily contracts requires that this doctrine of *ultra vires* should be confined within narrow bounds." At *page 373:* " Directors cannot act in opposition to the purpose for which their company was incorporated, but short of that, they may bind the body just as corporations in general may do."

*Leslie* v. *Lorillard, 110 N. Y. 519.* Plaintiff was a stockholder of the Old Dominion Steamship Company of Delaware, successor of the Old Dominion Steamship Company of New York. The Lorillard Steamship Company was a New York corporation, and was engaged in a competing business with the Old Dominion (New York) company. An agreement was entered into between the two companies by which the Old Dominion company agreed to pay a certain sum monthly to the Lorillard company if it would discontinue the running of its vessels or of any other between the ports mentioned, and that it would not charter or sell the vessels to any other company or person on that route, and would not become interested in the running of steamships between those places.

The plaintiff, the new company, being subjected to the liabilities and contracts of the former, sought to enjoin the payment to the Lorillard company, and demanded an injunction and the cancellation of the contract and the repayment by the Lorillard company. There was a demurrer which was sustained.

Ellerman *v.* Chicago Junction Railways &c. Co.

The court says (at *p. 535*): "The contracts were within the power of the corporation to make, and if they were free from the taint of fraud and were not procured to be made by some collusion or conspiracy, then they are binding upon the company and constitute an obligation which the officers must discharge." At *page 536*: "We think as these contracts were not *ultra vires*, or assailable on grounds of public policy, that they were such as came within the discretionary powers of the board of management to make in the interests of the corporation. Within the limits of the chartered authority, the officers of a corporation have the fullest power to regulate its concerns according to their best judgment." At *page 537*: "These contracts were such as the corporation could legitimately make, and consequently came within the scope of the ordinary powers of corporate management." Referring to the then recent case of the *Diamond Match Co.* v. *Roeber, 106 N. Y. 473*, the court (at *p. 534*) says: "Under the authority of that case, it may be said that no contracts are void as being in general restraint of trade, where they operate simply to prevent a party from engaging or competing in the same business." It is there said (at *p. 483*): "To the extent that the contract prevents the vendor from carrying on the particular trade it deprives the community of any benefit it might derive from his entering into competition. But the business is open to all others, and there is little danger that the public will suffer harm from lack of persons to engage in a profitable industry. Such contracts do not create monopolies. They confer no special or exclusive privileges.

"Under the doctrine of that case, it is difficult to see how the contracts which are complained of here are open to the objection suggested by counsel. Regarded only in the light of what they intended to effect, these agreements removed a dangerous rival, whose competition may have been deemed dangerous to the success or maintenance of the business of the Old Dominion company. They could not, of course, exclude all competition in the business, but would in that particular case."

In *Livestock Association* v. *Levy, 54 N. Y. Sup. Ct. 32*, an agreement by a corporation whose business was that of buying

and selling sheep and lambs, and buying and selling sheep and lambs on commission, and a corporation whose business was that of selling sheep and lambs on commission, that the stockholders of the first corporation, who engaged in the business of butchering sheep and lambs for the New York market, should, for a period of three years, buy their sheep and lambs from the members of the second corporation, and that the members of the second corporation should, during the same period, sell sheep and lambs for the New York market to the members of the first corporation only, was held not to be against public policy.

In *Central Shade Co.* v. *Cushman, 143 Mass. 353,* the manufacturers of a certain kind of curtain fixtures, desiring to avoid competition, formed a corporation in which they were the only stockholders, and an agreement was executed by the corporation on the one part and the three manufacturers of the other, by the terms of which the manufacturers gave the corporation the sole right to sell said curtain fixtures for three years, the corporation agreeing to buy, at a specified price, all that the manufacturers might make, and the manufacturers, acting as the agents of the corporation, receiving a commission on goods sold by them. The agreement provided that during its term the manufacturers should not dispose of their patents except upon such terms that the transferree should be bound by the agreement, and that they should not dispose of their stock in the corporation without the written assent of the majority of the stockholders. It was held that the agreement was not void as against public policy, and that the court would restrain, by injunction, one of the manufacturers from selling goods on his own account, in violation of the agreement.

In *Gloucester Co.* v. *Russia Co., 27 N. E. Rep. 1005,* an agreement between two manufacturers of glue, the object of which was to avoid competition between themselves and secure to each a reasonable profit, was held not to be against public policy.

A doubt was suggested by the learned counsel for the complainant, in his argument, whether or not the covenants of the

packers, in covenants seven and eight of the contract, are not void as in illegal restraint of trade.

There is no direct attack on the contract made by the bill on these grounds. It may, however, be said that it is raised collaterally on the question of *ultra vires,* on the ground that directors would have no power to use the funds of a corporation in performing an agreement which could not be enforced against the other parties, or it may be proper to consider it under the allegation of the bill that it is a payment of moneys contrary to the rights of the stockholders and to law and equity. The question has already been partially reviewed in considering whether a corporation can legally make an agreement for non-competition.

It will be observed that no exclusive privileges are granted by any of the covenants of the contract. So far as the Transit Company, the *quasi* public corporation involved, is concerned, no restriction of privilege or accommodation to any person or the public is contemplated. The covenants are those of the packers and relate to their own business.

. The seventh and eighth covenants referred to are as follows : The seventh covenant is that the parties of the second part will not, as long as the Transit Company conduct their stockyard business within the present limits of Chicago, engage in or carry on directly or indirectly, or be engaged or concerned or interested, or permit or suffer their names to be used or employed in carrying on there the business of stockyards for the general use of the public; and by the eighth, that they will not, during the term of fifteen years, in the city of Chicago or at any place within two hundred miles thereof, engage in the business of public or private stockyards in any manner or form whatsoever.

The rule as formulated by Mr. Freeman, in his notes to *Augier* v. *Webber, 92 Am. Dec. 748* (at *p. 751*), is : "Contracts which impose an unreasonable restraint upon the exercise of a business, trade or profession are void, but contracts in reasonable restraint are valid," referring to *2 Add. Cont. (Abb. ed.) 1150; Bish. Cont. §§ 515, 516; Metc. Cont. 232; 2 Pars. Cont. 748; Whart. Cont. §§ 430, 431; Benj. Sales §§ 520 et seq.; 2 Pom.*

*Eq. Jur.* § *934; 1 Sm. Lead. Cas., notes to Michael* v. *Reynolds,*. and a vast number of cases. The validity of the restrictions is to be governed by their reasonableness at the time of making the contract. *Ibid. p. 753.* See considerations of the point in cases. *4 Harvard Law Review,* "On Contracts in Restraint of Trade." Vice-Chancellor Van Fleet, in the syllabus of *Mandeville* v. *Harmon, 15 Stew. Eq. 185,* says: "The test to be applied in determining whether a restraint is reasonable or not, is to consider whether the restraint is only such as is necessary to afford a fair protection to the interest of the party in whose favor it is given, and not so large as to interfere with the interest of the public." *Brewer* v. *Marshall, 4 C. E. Gr. 537.* See, also, reference to other cases to same effect in *92 Am. Dec. 752.*

For cases illustrating the rule, see *92 Am. Dec. 756, 757, 758.*

As to the seventh covenant, the packers have sold out their Central stockyards practically to the Junction Company, and a great inducement for that corporation to buy the Central stockyards was this covenant of the packers not to carry on such business in the present limits of the city of Chicago so long as the Transit Company should carry on that business in that city.

This covenant seems to be eminently reasonable. The packers sold the Central stockyards and the good-will of their business therein. Their business was established, large and valuable. They sold both the yards in which the business is carried on, and the business itself, to their covenantees.

It is reasonable in this, it is for a definite time, to wit, a continuance of the Transit Company in the stockyard business in Chicago, and the restraint is limited to a particular locality, to wit, the city of Chicago. So far forth as this covenant is concerned, the packers may carry on the business of general stockyards anywhere and everywhere else in the world. Having sold their stockyards for their own price, if not a fraud, it would be most unjust for them, so long as the facilities furnished by the covenantees was ample for their business, to open new yards in competition. The stockyard accommodations furnished by the company are on an extensive scale, and it is apparent that its business would not be fairly protected if the packers were to

engage in such competitive business. So far as the interests of the public are concerned, the quotation from *Diamond Match Co.* v. *Roeber, 106 N. Y. 473*, made in *Leslie* v. *Lorillard, 110 N. Y. 519, supra*, would seem to be entirely appropriate and conclusive. These considerations, of course, also apply to the eighth covenant, which is also partial as to time, as it endures but for fifteen years, and partial as to locality in that it is limited to the part of the country within two hundred miles of the city of Chicago.

Considering the nature of the business, I cannot say that this limitation of two hundred miles is unreasonable. The compass to which the business is extended, and in which it has necessarily been carried on in its material parts, reaches out to the most distant territories of the Union, and the contracts under which the business of the stockyards is carried on extend to the most distant plains of the far western and southwestern states. The thousands of cattle and live stock that are herded and pastured upon these plains are the subject-matter of the business. Stockyards for the collection and merchanting of this stock may be located at many central points of railroad junctions. Omaha, St. Louis, Cincinnati, Cairo, Terre Haute and other places are points at which the stockyards business may be carried on advantageously. In any or all of these points, anywhere beyond two hundred miles from Chicago, the packers may continue to carry on that business, and in any or all of them the stockyards business of the Junction Company may be, to a considerable extent, interfered with. At any place within two hundred miles of Chicago, the stockyards business, if carried on by the packers, would directly or positively interfere with the business of the Junction Company. Outside of the limit of two hundred miles, the interference would be indirect.

It is obvious that with reference to a business of such an extent as that of the stockyards, covering, as it does, the transaction of business by correspondence and contracts the extended territory indicated, a covenant not to exercise the business within a certain place or within two hundred miles thereof is reasonable.

17

Several reported cases have held restrictions of one hundred and fifty and two hundred miles reasonable, where it was not so apparent as in this. *92 Am. Dec. 756 et seq.*

In my opinion, the covenants entered into by the company in this contract are referable to the objects stated in their certificate of incorporation or to powers incident to the corporation, and are authorized by its charter, and that covenants seventh and eighth, entered into by the packers, are not in illegal restraint of trade, and advise that the bill be dismissed, with costs.